The Insurance Department of The Commonwealth of Pennsylvania and William J. Sheppard, Insurance Commissioner, Appellees, *v.* Saint Lukes Hospital of Bethlehem, Pennsylvania, Muhlenberg Medical Center, Inc., The Allentown Hospital Association, The Palmerton Hospital, Gnadden Hutten Memorial Hospital, Allentown Osteopathic Hospital, Inc., The Allentown Sacred Heart Hospital Center, Inc., Good Shepherd Homes, Appellants.

The Insurance Department of The Commonwealth of Pennsylvania and William J. Sheppard, Insurance Commissioner, Appellees, *v.* The Sacred Heart Hospital and Easton Hospital, Appellants.

Argued June 5, 1975, before President Judge BOWMAN and Judges KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. Judge CRUMLISH, JR., did not participate.

*James H. Stewart, Jr.*, with him *Nauman, Smith, Shissler & Hall*, for appellants.

*Linda S. Lichtman*, Assistant Attorney General, with him *Andrew F. Giffin*, Assistant Attorney General, *Gerald Gornish*, Deputy Attorney General, and *Robert P. Kane*, Attorney General, for appellees.

OPINION BY JUDGE MENCER, August 5, 1975:

These are appeals from the Insurance Department's refusal to approve a reimbursement contract between the Hospital Service Plan of Lehigh Valley (Blue Cross) and its contracting hospitals (appellants).[1] The Act of November 25, 1970, P.L. 707, Title 40, §6124(a), *added* by the Act of November 15, 1972, P.L. 1063, §1, 40 Pa. C.S.A. §6124(a) (Supp. 1975-76), provides:

"(a) General rule.—The rates charged to subscribers by hospital plan corporations, all rates of payments to hospitals made by such corporations

---

1. Blue Cross did not file an appeal from the Insurance Department's ruling.

pursuant to the contracts provided for in this chapter, all acquisition costs in connection with the solicitation of subscribers to such hospital plans, the reserves to be maintained by such corporations, the certificates issued by such corporations representing their agreements with subscribers, and any and all contracts entered into by any such corporation with any hospital, shall, at all times, be subject to the prior approval of the department."

Each of the appellants is a hospital providing medical services to subscribers of Blue Cross, and they were member hospitals of Blue Cross until July 1, 1972, when their last contract expired. Appellants have negotiated jointly with Blue Cross as to the form of the reimbursement contract, and such negotiations have been going on since July of 1972. These hospitals have been reimbursed on an interim basis since July of 1972, but no final settlements have been held for the ensuing period. A form of contract was submitted by Blue Cross to the Insurance Department for approval on April 9, 1973 which was approved by the Department on June 18, 1973, but appellants refused to execute this form of contract.

Negotiations finally resulted in the execution of a contract between each of the appellants and Blue Cross similar to the one approved by the Insurance Department on June 18,1973, one difference in the contract being the present refusal of the hospitals to agree to abide by the regulations and/or recommendations of the Insurance Commissioner and, in lieu thereof, their agreement "to give consideration to suggestions from all sources." The form of the last negotiated contract was submitted to the Department for approval on or about September 18, 1974.

Notice of the filing at No. 6-V-74 of this contract was given in the Pennsylvania Bulletin, Vol. 4, No. 41, at page 2094, on September 28, 1974, requesting interested parties to submit comments, suggestions, or objections within

thirty days, pursuant to the provisions of Section 6124 (b), *added* by the Act of November 15, 1972, 40 Pa. C.S.A. §6124(b) Supp. 1975-76). Thereafter, on November 2, 1974, in the *Pennsylvania Bulletin*, Vol. 4, 47, at page 2344, notice was given of "a public informational hearing concerning Blue Cross of Lehigh Valley's [filing No.] . . . 6-V-74 (hospital contract)" to be held on November 13, 1974 in Allentown. The notice went on to state that the hearing would be in addition to the written comments on the filing which had been requested. No written comments, suggestions, or objections were received by the Insurance Department from any of the appellant hospitals or from any other parties.

On November 18, 1974, the Insurance Department refused to approve the contract in question, and the Insurance Commissioner set forth the reasons for such refusal in the following letter:

"November 18, 1974

"Earl G. Wray, Jr.
Executive Director
Blue Cross of Lehigh Valley
1221 Hamilton Street
Allentown, Pennsylvania 18102

Re: Hospital Service Plan of Lehigh Valley
(Blue Cross of Lehigh Valley) Filing
6-V-74 (hospital contract)

Dear Mr. Wray:

"Pursuant to the authority granted this Department by 40 Pa. S. §6124 of the Nonprofit Corporation Law of 1972, I hereby disapprove the above-referenced filing of a reimbursement contract between Blue Cross of Lehigh Valley and its contracting hospitals, submitted to the Department via your letter of September 17, 1974, received September 18, 1974. I am disapproving the contract for the following specified reasons:

"(1) Section 5(E) of the proposed contract reads 'Hospital agrees to make every effort to minimize costs and actively promote programs which will increase efficiency and minimize expenditures, and to give consideration to suggestions in this regard from all sources.'

"This provision is so general and non-specific as to be virtually meaningless. No standards exist to evaluate and therefore enforce the requirements of making 'every effort,' and 'actively promoting.' A committment [sic] merely to 'consider' suggestions represents no committment at all.

"This provision is to be contrasted with the provision contained in the hospital contract approved by this Department on April 10, 1973:

'Hospital agrees to make every effort to minimize costs and to actively promote programs which will increase efficiency and minimize expenditure, *including but not limited to following the recommendations and/or regulations of the office of the Insurance Commissioner of the Commonwealth of Pennsylvania regarding Hospital costs programs.'*

"In view of the Insurance Department's detailed and specific guidelines for quality, cost control and consumer protection provisions in Blue Cross hospital contracts, this earlier provision represented a real committment to tangible, identifiable reforms.

"While the provision in the approved contract may have been unacceptable to the contracting hospitals, nevertheless Section 5(E) of the current filing is so vague and nonspecific as to be an unacceptable substitute. At the very least, hospitals' committment to specific required cost saving and other programs should be clearly set forth in the contract.

"(2) The proposed contract does not contain a provision requiring submission of hospital budgets to

Blue Cross and at the very minimum provide Blue Cross with the right of review and comment.

"I believe this to be one of the most basic methods of cost containment and assuring public accountability of hospitals. In view of Blue Cross's agreement to pay hospital costs, I believe that Blue Cross has an affirmative obligation to know what those costs are and to evaluate their reasonableness. Failure to make such evaluations gives hospitals a virtual blank check which Blue Cross must pay, and therefore is a primary factor in Blue Cross's repeated requests for rate increases.

"Furthermore, budget review is the first step in implementing a program of prospective reimbursement of hospitals. While prospective reimbursement may not be a total panacea for spiralling hospital costs, it does represent an innovative attempt to deal with the problem. And you indicated by letter in June of 1971, and again in the April 30, 1974 rate hearing that Blue Cross of Lehigh Valley was working on a program of prospective reimbursement. It is time that something tangible be done in furtherance of that committtment.

"(3) The proposed contract does not contain a reasonable cost ceiling.

"While we all realize that hospitals, like us all, are living in an inflationary economy, and are thus concerned about unreasonable ceilings perhaps causing them to be unable to meet incurred expenses, I do not believe this to be an excuse for no ceilings at all. The absence of any cost ceiling for reimbursement removes an incentive for hospitals to contain their costs and cost increases. Again this is a major factor in Blue Cross's all too frequent requests for rate increases.

"(4) While the proposed contract does contain a limitation on reimbursement when hospital occupancy

falls below a minimum level, the proposed limitation (90% of the average percentages of occupancy of all member hospitals) does not effectively limit reimbursement during periods of low or declining occupancy and overbedding in your service area. Thus there is no incentive for hospitals to remove expensive and unused beds from service since Blue Cross will pay for them anyway. A lower limit on occupancy per individual hospital would be more appropriate, and in fact was contained in the hospital contract approved for use from July 1, 1971 to June 30, 1972.

"(5) The proposed contract, in Paragraph 1 (E), provides that Blue Cross will pay the costs of collection from Blue Cross subscribers relating to charges which are subsequently disallowed as a result of utilization review.

"If a hospitalization is disallowed for reimbursement as improper, it is properly the responsibility of the hospital and the responsible physicians, not Blue Cross subscribers, to bear the cost burden. Recent litigation indicates a trend toward legal recognition of this principle. Perhaps this will encourage hospitals and physicians to be more careful so as to eliminate expensive unnecessary hospital admissions and unnecessarily long stays. At any rate, Blue Cross subscribers should not bear hospital collection costs for services disallowed as unnecessary.

"If Blue Cross of Lehigh Valley desires a formal hearing on this matter pursuant to the Administrative Agency Law (71 P.S. §1710.1 et seq.) please so indicate in writing to me within ten days of your receipt of this disapproval letter.

"It is my understanding that Blue Cross of Lehigh Valley will continue to reimburse hospitals on an interim basis, as it has been doing since July 1, 1972, until an acceptable contract can be implemented. If an acceptable contract cannot be agreed upon within a

reasonable time, this Department will have to consider whether the hospitals in your area should in fact be considered non-participating, with consequent changes in reimbursement method then being made.

"I and my staff of course remain available to discuss these matters and assist you in whatever ways are possible.

> Sincerely yours,
> William J. Sheppard
> Insurance Commissioner"

(Emphasis in original.)

The appeals taken from the Insurance Department's refusal to approve the contract were consolidated for argument by order of this Court on January 9, 1975. Appellants filed a Petition for Certiorari Sur Diminution of the Record, and the Department filed an answer thereto. By order dated May 1, 1975, we deferred the determination of this petition until the argument on the merits and directed the printing of the material as an appendix to the record. We now grant appellants' petition and consider the material in dispute to be a part of the record before us.

On January 31, 1975, the Insurance Department filed a motion to quash these appeals, and appellants filed an answer and subsequently, with leave of court, an amended answer. We have carefully considered the motion to quash and find it to be without merit and therefore deny this motion.

Sections 6124 (b) and 6102 (f) (40 Pa.C.S.A. §6102 (f) (Supp. 1975-76)) provide for judicial review of the orders of the Insurance Department in the manner provided by law. Section 51 (a) (3) of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended,* 71 P.S. §1710.51 (a) (3) (Supp. 1975-76), makes the provisions of the Administrative Agency Law applicable to the Insurance Department. With respect to our scope of review, Section 44 of the Administrative Agency Law, 71 P.S. §1710.44, states:

"The court to which the appeal is taken shall hear the appeal without a jury on the record certified by the agency. After hearing, the court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of sections thirty-one to thirty-five inclusive of this act [71 P.S. §§1710.31-1710.35] have been violated in the proceeding before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set aside or modify it, in whole, or in part, or may remand the proceeding to the agency for further disposition in accordance with the order of the court."

As stated in *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 573, 109 A.2d 331, 334-35 (1954), "it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion."

Adhering to these guidelines and admonitions, we have reviewed the record in this case and conclude that the Insurance Department's refusal to approve the contract here in question must be affirmed.

The Insurance Commissioner's letter of November 18, 1974 stated five reasons for the Department's determination. All of these reasons relate to the contractual rates of payment to hospitals by Blue Cross. Initially, we note that the fifth reason dealt with Paragraph 1 (E) of the proposed contract which provides that Blue Cross will pay the costs of collection from Blue Cross subscribers relating to charges which are subsequently disallowed as a result of utilization review. Appellants do not press their contention that this reason is a manifest and flagrant abuse of discretion by the Insurance Department and have indicated a willingness to delete this provision of the contract if by so doing the balance of the contract could be approved. Understandably, appellants now take this position since it cannot be seriously contended that, when hospitalization is disallowed for reimbursement as improper, Blue Cross subscribers, rather than the hospital and the responsible physicians, should shoulder the resulting cost burden. This reason, coupled with our limited scope of review, might of itself justify our affirmance.

Next, we turn our attention to the second reason advanced by the Insurance Department for its ruling. The proposed contract does not contain a provision requiring submission of hospital budgets to Blue Cross. Our analysis of this reason, when viewed from the standpoint that the rates charged to subscribers by Blue Cross are subject to approval by the Insurance Department, convinces us that it does not constitute a manifest and flagrant abuse of the Department's discretion. Since Blue Cross has contracted to pay the hospital costs for inpatient-covered services furnished to its eligible subscribers, it would seem axiomatic that Blue Cross would need to know, as nearly as possible, what the costs will be, as projected by budget estimates. Without such information, the rates of payments to the hospitals are virtually open ended, with Blue Cross obligated to make payment of final cost figures. This practice fuels a further request by

Blue Cross for rate increases and encourages hospitals to operate with less cost consciousness.

The third stated reason—the proposed contract does not contain a reasonable cost ceiling—is merely a corollary to the second reason. The lack of budget information and absence of a reasonable cost ceiling unnecessarily increase the likelihood of higher rates of payment to hospitals by Blue Cross. Fixed rates established by negotiation and based on realistic budget estimates are certainly more susceptible to approval than the undetermined blanket cost commitment proposed here.

We think that the fourth reason advanced was a reasonable one, and we repeat it since it is both self-explanatory and persuasive:

"(4) While the proposed contract does contain a limitation on reimbursement when hospital occupancy falls below a minimum level, the proposed limitation (90% of the average percentages of occupancy of all member hospitals) does not effectively limit reimbursement during periods of low or declining occupancy and overbedding in your service area. Thus there is no incentive for hospitals to remove expensive and unused beds from service since Blue Cross will pay for them anyway. A lower limit on occupancy per individual hospital would be more appropriate, and in fact was contained in the hospital contract approved for use from July 1, 1971 to June 30, 1972."

Although we agree that the first reason advanced by the Insurance Department is not sufficient to warrant a refusal to approve the contract, since the Insurance Department is without authority to compel contractural adoption of the Insurance Commissioner's recommendations and guidelines, we do conclude that reasons two through five are of substance and therefore there has not been, in the instant case, a manifest and flagrant abuse of discretion or a purely arbitrary execution of the Insurance Department's duties or functions.

Therefore, we make the following

ORDER

Now, this 5th day of August, 1975, the Insurance Department's refusal to approve a reimbursement contract (Filing 6-V-74) between the Hospital Service Plan of Lehigh Valley (Blue Cross of Lehigh Valley) and its contracting hospitals is hereby affirmed. Further, the contracting hospitals' Petition for Certiorari Sur Diminuton of the Record s granted, and the Insurance Department's motion to quash is denied.

———

DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

Emerging from the procedural morass of this appeal are several related issues centering upon the power and authority conferred upon the Insurance Commissioner by section 6124 of the Nonprofit Corporation Law of 1972, 40 Pa. C.S. §6124.[1]

In disapproving a proposed contract between a hospital plan corporation (Blue Cross of Lehigh Valley) and its participating hospitals, the Insurance Commissioner assigned five reasons for his action, four of which are in issue here. In doing so, he purportedly acted under the authority conferred upon him by these statutory provisions.

As I understand the majority opinion of this Court, the Commissioner acted beyond the bonds of his authority in disapproving the proposed contract because it did not require the contracting parties to follow his recommendations and/or department regulations regarding hospital cost programs as found in previously published "guidelines," or otherwise. I share this view.

I dissent, however, from the majority view that the remaining contested reasons assigned by him in disapproving the contract are within his power to impress upon the contracting parties.

———

1. The full text of which is set forth in the majority opinion.

The remaining three reasons involve his insistence that any such contract includes (1) submission of hospital budgets to Blue Cross for its review and comment thereon, (2) a cost ceiling for reimbursement purposes, and (3) a limitation on reimbursement related to minimum level of occupancy. In my opinion, the first of these three remaining reasons is meaningless vis-a-vis the acknowledged power of the Commissioner to approve rates of payments to hospitals by hospital plan corporations, and is patently an attempt by the Commissioner to do indirectly that which the majority acknowledges he cannot do directly, *i.e.*, control hospital cost programs. The second and third remaining reasons, while superficially related to his power to approve rates of payments to hospitals, upon scrutiny, reveal a want of any significant correlation to such rates and again demonstrate his intent and attempts to inject himself into the role of superadministrator of hospitals participating in such health delivery programs, a subject on which his expertise is not acknowledged.

As I view the role of the Commissioner and the Insurance Department under this statute, it cannot be questioned that rates to subscribers and rates of payments to hospitals are subject to his approval after appropriate hearing on the subject of such rates. However, he cannot under his authority to approve "contracts entered into by any such [hospital plan] corporation with any hospital," as a condition to such approval, require adoption of hospital cost programs or hospital management and administrative policies representative of what he conceives to be programs or policies which, if adopted, *may* reduce costs and hence, *may* reduce rates.

By conferring upon the Commissioner the limited powers expressed in section 6124, the legislature certainly did not intend to repose in him the role of autocrat of the health delivery system in Pennsylvania.

A review of the history of this controversy, as revealed by the record in this appeal, discloses, in my opinion, a blatant attempt by the former Commissioner and followed by the present Commissioner to indirectly do what he is without authority to directly do, namely, assume superintendency over hospital administration and fiscal management. Even if one assumes that he has power and authority to insist upon inclusion in such contracts provisions covering the subjects of his second, third and fourth reasons for disapproving the proffered contract, I think the record can only support a conclusion that he abused his discretion in doing so.

I would reverse the Commissioner disapproving the proposed contract and remand the matter to him for further proceedings incident to which public hearing should be afforded to all parties in interest, including the proposed contracting hospitals. If he is to question the rates to be charged by such hospitals, his intent to do so should be clearly expressed and the reasonableness of such rates determined not by what the Commissioner subjectively believes to constitute good hospital fiscal and management policy as directly related to rates but what the evidence discloses.